**Opinion issued March 17, 2022**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00493-CV

————————————

**CAROLYN FROST KEENAN, Appellant**
**V.**

**RIVER OAKS PROPERTY OWNERS, INC., Appellee**

---

**On Appeal from the 133rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-03190**

---

## MEMORANDUM OPINION

Appellant, Carolyn Frost Keenan ("Keenan"), challenges the trial court's summary judgments in favor of appellee, River Oaks Property Owners, Inc. ("ROPO"), in ROPO's suit against Keenan for a violation of a restrictive covenant and for declaratory judgment, and on Keenan's counterclaims to quiet title and for

violations of the Fair Housing Amendments Act of 1988 ("FHAA"), the Texas Fair Housing Act ("TFHA"), and the City of Houston Fair Housing Ordinance ("HFHO").[1]  In two issues, Keenan contends that the trial court erred in granting summary judgment and in striking portions of her summary-judgment evidence.

We affirm.

## Background

River Oaks is a residential subdivision located near downtown Houston that was developed in the 1920's.  According to the record, in 1926, the developer, "River Oaks Corporation" ("ROC"), adopted the "Section One (1) Reservations, Restrictions and Covenants in the River Oaks Addition" (the "Original Restrictions").  They were made part of "each and every contract, deed or conveyance" and made "binding upon the successors, heirs, assigns and legal representatives of [ROC] and of the grantee in every such contract or deed."

Thereafter, as the River Oaks area grew, supplemental sets of restrictions were adopted for each section.  In 1929, as pertinent here, ROC adopted the "Section Five (5) Additional Reservations, Restrictions and Covenants in River Oaks Addition Supplementing Resolutions of [various dates]" (the "Supplemental Restrictions").  The Original and Supplemental Restrictions (collectively, the "Restrictions") set out

---

[1]     *See* 42 U.S.C. § 3604 (FHAA); TEX. PROP. CODE § 301.025 (TFHA); HOUSTON, TEX., CODE OF ORDINANCES, ch. 17, art. III, § 17-12(f) (2021) (HFHO).

a series of General Restrictions on the use of property in River Oaks and authorized ROC to enter property and to "summarily abate or remove" any violation. The Restrictions provided that their term expired on January 1, 1955, but that they could be extended for successive additional ten-year periods, as follows:

> These restrictions shall be effective until January 1, 1955, but at any time within five years before January 1, 1955, the then owners of a majority of the square foot area of the lots in this Addition may, by written declaration, signed and acknowledged by them, and recorded in the deed records of Harris County, Texas, extend these restrictions, conditions and covenants, (or any others hereafter adopted with reference to this property in accordance herewith) for a period of ten years additional, and then similarly, for successive additional periods of ten years as often and as long as the owners of the majority of the square feet of the property may desire.

In 1954, ROPO was formed. Its corporate charter states that its purpose included "the protection of properties and rights." In 1963, ROC assigned to ROPO "all of the rights relative to the restrictions."

The record shows that the River Oaks property owners extended and re-adopted the Restrictions in 1955, 1965, 1975, 1985, and 1995. At each renewal, the property owners expressly authorized ROPO, as successor to ROC, to act in their names and on their behalf.

In 2004, ROPO's Board of Directors (the "Board") formed a Restrictions Restatement Committee (the "Committee") to modernize and consolidate the 23 sets of restrictions governing the different sections of River Oaks into one set of restrictions and to provide for their automatic renewal. The Committee held various

town hall meetings. In October 2004, ROPO sent a letter to all of the River Oaks property owners, presenting a list of proposed amendments and inviting them to a meeting. In March 2005, ROPO mailed letters to the property owners, along with the final version of the proposed amended restrictions, a summary of the amendments, and a ballot seeking affirmative votes.

It is undisputed that, in August 2005, a River Oaks resident, Bert Langdon, formed a group to protest the proposed amended restrictions. Langdon created and circulated to each property owner a false ballot and letter asking them to vote against the proposed amendments and to return their vote to him. He also circulated a false rescission form, purporting to allow any property owner who had previously submitted an affirmative vote to ROPO to rescind their vote.

In January 2006, ROPO determined that the official ballots that it had circulated to property owners did not include a date by which the property owner had to return the ballot for it to be counted, as required under the Texas Property Code. In February 2006, ROPO returned each of the ballots that had been submitted, with a stamp asking for a re-affirmation of the vote and directing that it be returned to ROPO by December 1, 2006. ROPO also sent a corrected ballot to each of the property owners who had not previously voted.

On June 2, 2006, ROPO, having determined that it had a sufficient number of votes to approve the amendments, filed in the real property records a "Certification

4

of Receiving and Counting Ballots on Amendments to Reservations, Restrictions, and Covenants Applicable to All Properties Located Within River Oaks Additions." ROPO's Certification stated that it had circulated to each of the property owners in River Oaks a copy of the proposed "Amendments to Reservations, Restrictions and Covenant Applicable to All Properties Located within River Oaks Additions, Including Tall Timbers Section and Country Club Estates Addition" (the "Amended Restrictions"), a summary of the amendments, and a ballot, containing the date by which it had to be returned to be counted. And, as required by Property Code section 204.005, the owners of at least 75 percent of the real properties in River Oaks had voted in favor of and to approve the Amended Restrictions. ROPO certified that:

> According to the ownership records maintained by the Association, the total square footage within all properties in the Subdivision [all sections of River Oaks] is 32,602,253, and the owners of the properties in the Subdivision containing a total square footage of 24,735,885 voted in favor of and to approve the Amended Restrictions (75.87%). The Ballots are and will be kept in the files of the Association.[2]

Thereafter, the Amended Restrictions became effective unless terminated by a vote.

On November 11, 2011, ROPO recorded its updated "Policies and Procedures with Architectural Review and Approval Process" (the "Policies and Procedures"),

---

2   *See In re Keenan*, 501 S.W.3d 74, 78 (Tex. 2016) (granting "mandamus relief directing the trial court to permit Keenan to copy the ballots and disclose them for purposes of discovery, expert analysis, trial preparation, and trial").

5

which governed the procedures for obtaining the required approval from the Board for proposed designs and the construction of improvements on an owner's lot.

At some point in or prior to 2011, Keenan, who lived in River Oaks and had voted in favor of the Amended Restrictions, inherited another River Oaks property. She became the sole owner of a lot with an existing house in the River Oaks Addition, Section 5, at 2940 Chevy Chase, Houston, Texas (the "Property"). Keenan had plans drawn up for the construction of a new house on the Property.

In its petition, ROPO alleged that, on November 15, 2011, Keenan submitted a proposed plan ("Proposal 1") to the Board for the construction of a new house and landscaping on the Property. Keenan's Proposal 1 included: (1) a parking area adjacent to the front door and off of the main driveway that was approximately 22 feet long and 17 feet wide; (2) a concrete wheelchair ramp, sloping up to a landing outside the front door of the residence; and (3) a concrete walkway from the city sidewalk to the front-door landing.

As pertinent here, paragraph 14 of the Amended Restrictions limited the impermeable area of a lot to a specific percentage of the total building area:

> After the effective date of this instrument, the total area of the footprints of a residential dwelling, garage, outbuilding and other improvement on a lot which has a foundation, and any impermeable hardscape on the lot, including by way of example and not in limitation, synthetic grass, driveways, walkways, swimming pools and tennis courts, shall not exceed one hundred percent (100%) of the total building area of the lot within the front, side and rear setbacks applicable to the lot, or, in the case of a lot with a total area less than 15,000 square feet, one hundred

6

ten percent (110%) of the total building area of the lot within the front, side and rear setbacks applicable to the lot, in addition to any other limitations on size, dimension or area. . . .

The stated purpose of this provision is to "preserve permeable areas for surface water, minimize the diversion of surface water to streets and adjacent lots, and preserve the historical character of River Oaks as a subdivision with substantial vegetation and open spaces." The Restrictions provide that plans for all walkways and driveways must be submitted to the Board "prior to installation or construction."

In Proposal 1, Keenan represented that the area of her lot was 12,472 square feet, that the allowable impermeable cover under the terms of the Amended Restrictions totaled 6,618 square feet, and that her proposed impermeable cover totaled 6,615 square feet.

On December 15, 2011, the Board granted Keenan preliminary approval of Proposal 1. Keenan then submitted a slightly revised version of Proposal 1 to the City of Houston (the "City"), who approved it and issued a building permit. On July 23, 2012, the Board, having determined that Keenan's changes were not material and that she was still within limitations, authorized her to commence construction.

On February 20, 2013, however, Keenan submitted a revised plan ("Proposal 2") to ROPO that differed significantly from Proposal 1 and from the City-permitted plan. In Proposal 2, Keenan sought to (1) increase the parking area adjacent to the front porch to approximately 33 feet long by 18 feet wide; (2) replace the sloping

concrete wheelchair ramp with a larger porch to be accessed by multiple steps on two sides of the porch; (3) replace the straight and non-continuous walkway with a curved and continuous walkway from the city sidewalk to the front landing; (4) add two side-yard brick-and-paver patios; and (5) add a concrete walkway and pad at the door to the garage apartment, as a back entrance. Proposal 2 increased the impermeable surface area of the Property from 6,615 square feet to 7,845 square feet, which was 1,230 square feet over Proposal 1.

On March 19, 2013, ROPO notified Keenan that it would not approve Proposal 2 because it exceeded the impermeable surface-area limitation in the Amended Restrictions. ROPO noted that Keenan could proceed with construction as previously approved in Proposal 1.

ROPO alleged that, in November 2013, it discovered that Keenan had in fact commenced construction of improvements *in accordance with Proposal 2*. On December 2, 2013, ROPO directed Keenan to stop the work, but she refused. By January 2014, Keenan had completed the work pursuant to Proposal 2. In 2014, Keenan and her husband moved into the new house on the Property.

ROPO sued Keenan for violating the Amended Restrictions, alleging that Keenan was bound by the Amended Restrictions governing the Property; that ROPO was entitled to enforce the Amended Restrictions; that Keenan had breached the terms of the Amended Restrictions by constructing improvements in violation of the

8

impermeable surface-area limitation; and that Keenan had refused to reduce any portion of the area installed. It also sought a permanent injunction requiring her to remove 1,260 square feet of impermeable cover, or the amount exceeding 110 percent of the total building area of her lot, within thirty days of judgment. ROPO also sought a declaration that the Amended Restrictions were valid and enforceable, that they constituted a valid contract between ROPO and Keenan, and that Keenan was required to remove 1,260 square feet of impermeable cover from the Property.

Keenan answered, generally denying the allegations and asserting various affirmative defenses. Keenan asserted that ROPO was not entitled to enforce the Amended Restrictions "as they are so vague and indefinite as to be unenforceable or impossible to perform," that they were "not properly executed," and that the "deed restrictions" governing River Oaks were "invalid and/or void under the Texas Property Code" and had "expired." She asserted that ROPO lacked standing to "enforce the restrictions at issue in this case, as its membership is limited to only those persons that have entered contracts with it." And, "[b]ecause its membership does not consist of owners of property within the subdivision [it] is not the designated representative of the owners in the subdivision." Keenan also asserted that the Restrictions "violate[d] the Fair Housing Act prohibition on discrimination against disabled individuals."

Keenan brought a counterclaim against ROPO to quiet her title, in which she asserted that the Amended Restrictions were "not properly approved by the requisite number of properties in River Oaks" and thus are unenforceable.[3] She asserted that the Amended Restrictions, if enforced, would interfere with her use and enjoyment of the Property, and she sought to remove "this cloud on her title to the Property."

Keenan also brought a counterclaim against ROPO for fair-housing violations, under the FHAA, TFHA, the HFHO. She asserted that she had requested an accommodation of the limitation on impermeable surfaces in the Amended Restrictions to allow for the installation of a van-accessible driveway and parking area for her disabled mother-in-law. She asserted that ROPO had refused to make a reasonable accommodation, in accordance with these provisions, which prohibit discrimination against a disabled person by refusing to make a reasonable accommodation in rules, policies, or practices if such is necessary to afford the person equal opportunity to use and enjoy a dwelling. Keenan sought a judgment declaring that allowing an increase in the amount of hardscape on the Property was

3     In July 2015, the trial court abated the case and ordered that Keenan "join each and every owner of real property in River Oaks, who is subject to the original and amended deed restrictions at issue in this case as proper parties to the counterclaims [she] asserted seeking to invalidate those restrictions." The trial court ordered that, if she failed or refused to do so, her counterclaims seeking to invalidate the restrictions governing River Oaks would be deemed dismissed, with prejudice. Thereafter, however, Keenan did not join the other property owners in River Oaks. ROPO notes in its brief: "At the end of the abatement period, Keenan was forced to amend her claims rather than proceed with joinder of all ROPO members.

10

a reasonable accommodation and that ROPO's enforcement of the Amended Restrictions relating to hardscape was arbitrary and capricious. Keenan also sought injunctive relief and actual and punitive damages, attorney's fees, and costs.

On May 20, 2015, ROPO moved to compel Keenan to identify her mother-in-law and her handicap in order to evaluate Keenan's fair-housing claims. At a June 1, 2015 hearing on the motion to compel, ROPO complained that Keenan was required to identify a disabled person needing the asserted accommodation and that Keenan had refused. Keenan's counsel responded that because Keenan's mother-in-law would not be called to testify at trial, Keenan was not required to identify her. Subsequently, during her June 17, 2015 deposition, Keenan identified her mother-in-law as Lavera Gaines and testified that she had arthritis.

In September 2018, ROPO filed three motions for partial summary judgment, encompassing all of its claims and Keenan's counterclaims and affirmative defenses. ROPO argued that the summary-judgment evidence conclusively established that it was entitled to judgment on its claims against Keenan for violation of a restrictive covenant and for declaratory relief, and against Keenan on her affirmative defenses and counterclaims to quiet title and for fair-housing violations. ROPO attached approximately 52 pieces of summary-judgment evidence, discussed as applicable below. ROPO asserted that Keenan did not present evidence raising any genuine issues of material fact.

11

With respect to its claim for violation of a restrictive covenant, ROPO argued that it was entitled to judgment as a matter of law because Keenan had judicially admitted, through assertions of fact in her pleadings, that she had violated the Amended Restrictions by constructing improvements and installing impermeable surfaces on more than 110% of the allowable building area of the Property. ROPO asserted it was entitled to a permanent injunction requiring Keenan to remove 1,260 square feet of impermeable surface, or that exceeding 110 percent of the total building area of her lot, within thirty days of judgment. ROPO further asserted that it was entitled to a declaration that the Amended Restrictions were validly enacted and enforceable by ROPO against Keenan's Property; that the Amended Restrictions constituted a valid contract between ROPO and Keenan; and that Keenan must remove 1,260 square feet of impermeable surface area from her Property to comply with the Amended Restrictions.

ROPO argued that it was entitled to judgment as a matter of law on Keenan's counterclaim against ROPO to quiet title because the evidence conclusively established that it amended the Original and Supplemental Restrictions in accordance with Property Code section 204.005, by obtaining approval of the owners of at least 75% of the real property in River Oaks and by filing its petition as a dedicatory instrument in the Harris County real property records. Thus, the Amended Restrictions did not constitute a cloud on Keenan's title.

ROPO argued that it was entitled to judgment as a matter of law on Keenan's counterclaim for violations of the FHAA, TFHA, and HFHO because the evidence conclusively disproved the elements of her claims. ROPO argued that the evidence established that Keenan did not, at the time she requested an accommodation from ROPO, identify any person for whom she sought an accommodation or establish that the person met the FHAA's definition of "handicapped." Rather, it was not until two years after ROPO had rejected Proposal 2, eighteen months after litigation had commenced, and only in response to a motion to compel, that she first revealed the identity of her mother-in-law to ROPO. ROPO also asserted that Keenan's request for an accommodation exceeding the maximum allowable impermeable cover of the Property was neither necessary nor reasonable and, if granted, would undermine the legitimate purposes of ROPO's land-use regulation designed to prevent flooding in River Oaks. ROPO asserted that Keenan's TFHA and HFHO claims similarly failed and were time-barred.

ROPO also argued it was entitled to judgment as a matter of law on Keenan's asserted affirmative defenses, i.e., of lack of notice, waiver, laches, estoppel, ratification, and waiver, because they failed as a matter of law.

In October 2018, Keenan filed a response to each of ROPO's motions for partial summary judgment, discussed in detail below, to which she attached various pieces of evidence. She argued that ROPO was not entitled to summary judgment

13

on her counterclaim to quiet title because the Amended Restrictions were not valid. She asserted that ROPO was not a "property owners association," and thus was without authority to amend the restrictions, and that it had failed to obtain approval of the requisite number of property owners to enact the Amended Restrictions. In support of her claim, Keenan presented the affidavit of Charles J. Jacobus, an attorney who examined the ballots and opined regarding the percentage of property owners who had approved the Amended Restrictions.

With respect to ROPO's claim against her for violating a restrictive covenant, Keenan presented the affidavit of Paul M. Valentine, a registered professional surveyor, who testified regarding the impermeable surface area of the Property. She also argued that ROPO was not entitled to attorney's fees because it had failed to give certain statutorily required notice.

Keenan argued that ROPO was not entitled to summary judgment on her counterclaim for fair-housing violations because she identified her mother-in-law as a disabled individual, and her request for an accommodation was reasonable. She asserted that her claims were not time-barred. In support, Keenan cited portions of her deposition testimony and certain December 2013 correspondence between her counsel and ROPO. She also presented a letter and affidavit from Jeromy Murphy, an accessibility expert, who opined that the driveway Keenan had requested was reasonable and necessary.

14

ROPO moved to strike certain portions of Keenan's evidence, namely, portions of the affidavits of Jacobus and Murphy, and the affidavit of Valentine.

On January 2, 2019, Keenan's mother-in-law, Gaines, died. In May 2019, ROPO filed a supplement to its motion for summary judgment on Keenan's counterclaims, arguing that her claims for violations of the FHAA, TFHA, and HFHO, and for declaratory relief, were moot because they were "completely dependent upon proof that [Keenan's] Property require[d] modification to accommodate a disabled person." As Keenan had ultimately identified Gaines, ROPO requested that the trial court take judicial notice of her death.

Subsequently, the trial court took the requested judicial notice and rendered a summary judgment in favor of ROPO on its claims for affirmative relief. The trial court found that Keenan was the owner of the Property; that she was bound by the Restrictions and Policies and Procedures; that she substantially breached the terms of the Restrictions and Policies and Procedures by constructing improvements in violation of the impermeable surface area limitation; and that ROPO was entitled to enforce the Restrictions and Policies and Procedures. It found that the Amended Restrictions were validly enacted and enforceable by ROPO against Keenan and her Property and that the Amended Restrictions constituted a valid contract between ROPO and Keenan. After finding that the River Oaks property owners would suffer irreparable injury for which any remedy at law would be inadequate if the violation

15

were not corrected, the trial court entered a mandatory injunction against Keenan, requiring her to remove 1,260 square feet of impermeable surface from her Property.

The trial court also rendered a summary judgment in favor of ROPO on Keenan's counterclaims and affirmative defenses. It ordered that Keenan take nothing on her counterclaims and held that she did not establish her affirmative defenses of failure of proper notice, waiver, abandonment, laches, estoppel, ratification, and excuse, all of which it dismissed with prejudice. The trial court also signed an order striking certain portions of Keenan's summary-judgment evidence, discussed below.

After a jury trial on attorney's fees, the trial court signed a final judgment with the following "declaratory findings":

1. [Keenan] is and was at all relevant times the owner of the [Property];

2. [Keenan] and the Property are bound by the Restrictions and Policies and Procedures that burden the Property;

3. [Keenan] distinctly and substantially breached the terms of the Restrictions and Policies and Procedures by constructing improvements in violation of the impermeable surface area limitation;

[4.] [ROPO] is entitled to enforce the Restrictions and Policies and Procedures.

The trial court "provide[d] [ROPO] with the following declaratory relief":

1. The Amended Restrictions, Policies and Procedures were validly enacted and are enforceable by [ROPO] against [Keenan] and her Property;

16

2. The Amended Restrictions constitute a valid contract between [ROPO] and [Keenan]; and

3. [Keenan] must remove at least 1,260 square feet of impermeable surface area from the Property to come into compliance with the Amended Restrictions within thirty (30) days of the date of entry of this Final Judgment.

The trial court found that ROPO established that Keenan violated the Amended Restrictions and Policies and Procedures that burden the Property by constructing improvements that exceeded the impermeable surface-area limitation imposed by the Amended Restrictions. The trial court entered an injunction requiring Keenan to remove 1,260 square feet of impermeable surface area from her Property in accordance with the Amended Restrictions. Further, the trial court ordered that Keenan take nothing on her counterclaims and ordered that she pay ROPO attorney's fees.

## Summary Judgment

In her first issue, Keenan argues that the trial court erred in granting summary judgment in favor of ROPO on its claims and on her counterclaims because ROPO failed to conclusively establish its right to judgment. In her second issue, Keenan argues that the trial court erred in striking portions of her summary-judgment evidence.

17

*Standard of Review and Overarching Legal Principles*

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In conducting our review, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Id*. If a trial court grants summary judgment without specifying the grounds, we will uphold its judgment if any of the theories advanced in the motion is meritorious. *Beverick v. Koch Power, Inc*., 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

In a traditional motion for summary judgment, the movant has the burden to establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp*., 988 S.W.2d 746, 748 (Tex. 1999). A plaintiff moving for summary judgment on its own claim must conclusively prove all essential elements of its cause of action. *Rhône–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). A defendant moving for summary judgment must conclusively negate at least one essential element of the plaintiff's cause of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

Only after the movant meets its burden does the burden shift to the non-movant to present evidence raising a genuine issue of material fact precluding summary judgment. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *see also McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993) ("[S]ummary judgments must stand or fall on their own merits, and the non-movant's failure to except or respond cannot supply by default the . . . summary judgment proof necessary to establish the movant's right. . . ."). Evidence raises a genuine issue if reasonable jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

## A.    *ROPO's Claim for Violation of a Restrictive Covenant*

ROPO moved for a summary judgment on its claim against Keenan for violation of a restrictive covenant, pursuant to Property Code sections 202.004 and 204.010, for which it sought injunctive relief. *See* TEX. PROP. CODE §§ 202.004, 204.010.

Property Code section 202.004(b) provides that a "property owners' association or other representative designated by an owner of real property may initiate, defend, or intervene in litigation . . . affecting the enforcement of a restrictive covenant or the protection, preservation, or operation of the property covered by the dedicatory instrument." *Id.* § 202.004(b); *see* § 204.010 (authorizing

19

property owners' association to exercise powers conferred by restrictions and to "institute, defend, intervene in, settle, or compromise litigation . . . on matters affecting the subdivision"). Section 202.004 establishes a cause of action and authorizes a trial court to assess civil damages for each day of the violation of a restrictive covenant. *KBG Invs., LLC v. Greenspoint Prop. Owners' Ass'n, Inc.*, 478 S.W.3d 111, 119 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "A court may assess civil damages for the violation of a restrictive covenant" of up to $200 for each day of the violation. TEX. PROP. CODE § 202.004(c). Section 202.004 creates a presumption that a property owners' association or other representative exercises its discretionary authority concerning a restrictive covenant reasonably "unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory." *Id.* § 202.004(a).

Ordinarily, injunctive relief may be granted only when the applicant proves the occurrence of a wrongful act giving rise to imminent and irreparable harm for which there is no adequate remedy at law. *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 76 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). However, in the context of the enforcement of restrictive covenants, the applicant is required to prove only that the defendant intends to do an act that would breach the restrictive covenant. *Id*. at 76–77.

20

In support of its motion for summary judgment, ROPO presented a copy of the Amended Restrictions. Paragraph 14 of the Amended Restrictions limits the impermeable surface of a lot to a specific percentage of the total building area, as follows:

> [T]he total area of the footprints of a residential dwelling, garage, outbuilding and other improvement on a lot which has a foundation, and any impermeable hardscape on the lot, including by way of example and not in limitation, synthetic grass, driveways, walkways, swimming pools and tennis courts, shall not exceed one hundred percent (100%) of the total building area of the lot within the front, side and rear setbacks applicable to the lot, or, in the case of a lot with a total area less than 15,000 square feet, one hundred ten percent (110%) of the total building area of the lot within the front, side and rear setbacks applicable to the lot, in addition to any other limitations on size, dimension or area. . . .

We review a trial court's interpretation of a restrictive covenant de novo. *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 279 (Tex. 2018). Restrictive covenants are subject to the general rules of contract construction. *Id*. at 280. In construing a covenant, we give effect to the objective intent of the drafters of the covenant as it is reflected in the language chosen. *Id*. When a restrictive covenant is unambiguous, as here, we construe it according to the plain meaning of its express wording and enforce it as written. *Vance v. Popkowski*, 534 S.W.3d 474, 478 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). The language in paragraph 14 of the Amended Restrictions prohibits, in the case of a lot with a total area of less than 15,000 square feet, as here, the construction of improvements (with foundations) and

21

"impermeable hardscape" on more than 110% of the total building area of the lot, within the setbacks.

ROPO presented the affidavit of Mathew J. Probstfeld, a registered professional land surveyor, who testified that he conducted a survey of the Property on October 8, 2014 (post-construction). He testified regarding the method he employed in surveying the property, and he attached the survey to his affidavit. He opined that, based on the survey and his inspection of the property, the allowable building area of the Property was 5,982 square feet, that the amount of allowable impermeable surface on the Property was 6,580 square feet, and that the combined area of improvements and impermeable surfaces totaled 7,840 square feet.

In its motion, ROPO asserted that Keenan "admits in her live pleading that she violated [paragraph 14] because the improvements on her property exceed the impermeable surface covenant," citing Keenan's First Supplemental Answer and Fourth Amended Counterclaim. The record shows that, in her First Supplemental Answer and Fourth Amended Counterclaim, Keenan stated: "Under the formula provided in the Restrictions, the allowable hardscape area for the Property is at least 6,788.4 square feet. The existing hardscape on the Property is 7,331 square feet. Therefore, Keenan is only requesting an additional 542.6 square feet of hardscape on the Property." Thus, Keenan admitted, in her live pleading, that she constructed impermeable surfaces in excess of that allowed under the Amended Restrictions.

22

Assertions of fact in a party's live pleadings are regarded as formal judicial admissions. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000). A judicial admission "not only relieves [an] adversary from making proof of the fact admitted but also bars the party himself from disputing it." *Id.* (internal quotations omitted).

ROPO also presented excerpts of Keenan's deposition, in which she testified as follows:

Q.   You admit in your pleadings that you willfully violated the restrictions, correct?

. . . .

A.   Correct. Because of my family situation, I felt I needed to accommodate, and I could never get a final answer out of the board.

Thus, ROPO presented summary-judgment evidence establishing that Keenan intentionally violated the Amended Restrictions. Further, because ROPO established that Keenan intentionally committed an act breaching a restrictive covenant, ROPO was entitled to injunctive relief. *See Feldman*, 436 S.W.3d at 77.

Because ROPO's summary judgment evidence establishes its right to judgment against Keenan on its claim for violation of a restrictive covenant, the burden shifted to Keenan to present evidence raising a genuine issue of material fact precluding summary judgment. *See Siegler*, 899 S.W.2d at 197.

In her summary-judgment response, Keenan argued that ROPO's exercise of authority in enforcing the Amended Restrictions was arbitrary and capricious

because ROPO "is not a 'property owners association,'" and therefore it was without authority to act, and because the Amended Restrictions are not valid. *See* TEX. PROP. CODE § 202.004(a) (creating statutory presumption that property owners' association exercises its discretionary authority concerning a restrictive covenant reasonably "unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory"); *Anderson v. New Prop. Owners' Ass'n of Newport, Inc.*, 122 S.W.3d 378, 390 (Tex. App.—Texarkana 2003, pet. denied) (holding that rejecting driveway plans without establishing authority to do so represented arbitrary and capricious exercise of discretionary authority).

### 1. *Authority to Act*

Keenan argued that ROPO was without authority to act as a property owners' association in amending the restrictions because ROPO was neither created by the deed restrictions nor formed pursuant to Property Code section 204.006. *See* TEX. PROP. CODE § 204.006 (governing "Creation of Property Owners' Association" when "existing restrictions applicable to a subdivision do not provide for a property owners' association").

As pertinent here, Property Code Chapter 204 defines a "property owners' association" as follows:

> (a)    A property owner's association is a designated representative of the owners of property in a subdivision and may be referred to as

24

a "homeowners association," community association," "civic association," "civic club," "association," "committee," or similar term contained in the restrictions. The membership of the association consists of the owners of property within the subdivision.

(b)  The association must be nonprofit and may be incorporated as a Texas nonprofit corporation. An unincorporated association may incorporate under the Texas Non-Profit Corporation Act [].

(c)  The association's board of directors or trustees must be elected or appointed in accordance with the applicable provisions of the restrictions and the association's articles of incorporation or bylaws.

*Id.* § 204.004.

ROPO presented evidence, as discussed above, that it has been the expressly designated representative of the owners of property in River Oaks since at least 1963. ROPO's evidence includes a 1963 Assignment from ROC to ROPO of "all of the rights relative to the restrictions." The Assignment notes that ROPO "was created, among other things, to assist in the enforcement of the[] restrictions." ROPO's evidence further shows that, in each renewal of the Restrictions since 1965, the property owners expressly designated ROPO to act in their names and on their behalf. *See id.* § 204.004(a). ("A property owners' association is a designated representative of the owners of property in a subdivision. . . ."). ROPO's evidence also reflects that the members of the association are property owners in River Oaks. *See id.*

25

In addition, ROPO presented its charter and articles of incorporation, which reflect that ROPO was chartered and incorporated as a Texas nonprofit corporation in 1954. *Id.* § 204.004(b) ("The association must be nonprofit and may be incorporated as a Texas nonprofit corporation."). Its corporate charter states that its purpose includes "the protection of properties and rights."

Keenan argued in her response that ROPO is not a property owners' association under section 204.004 because its directors are not elected in compliance with subsection (c). She complained that the restrictions make no mention of how ROPO's board is elected.

Section 204.004(c) provides: "The association's board of directors or trustees must be elected or appointed in accordance with the *applicable* provisions of the restrictions and the association's articles of incorporation or bylaws." *Id.* § 204.004(c) (emphasis added). As ROPO argues, when there are no applicable provisions in the restrictions, as here, the association's articles of incorporation or bylaws supplement the restrictions. Here, ROPO presented its articles of incorporation, which state that the board is to be elected as "provided in the bylaws." And, its bylaws contain a section setting forth how its board is to be elected.

Thus, the requisites of section 204.004 are met and there are no genuine issues of fact presented regarding ROPO's authority to act as a property owners' association.

2.      *Validity of the Amended Restrictions*

In her summary-judgment response, Keenan argued that, even if ROPO had the authority to act, it failed to obtain the proper approval from the property owners to enact the Amended Restrictions.

ROPO asserted that it amended the restrictions pursuant to Property Code section 204.005. *See* TEX. PROP. CODE § 204.005. Under section 204.005, a property owners' association has authority to approve and circulate a petition relating to the extension of, addition to, or modification of existing restrictions. *Id.* Such petition to extend, add to, or modify existing restrictions is effective if:

> (1)    the petition is approved by the owners, excluding lienholders, contract purchasers, and the owners of mineral interests, of at least 75 percent of the real property in the subdivision or a smaller percentage required by the original dedicatory instrument; and
>
> (2)    the petition is filed as a dedicatory instrument with the county clerk of the county in which the subdivision is located.

*Id.* § 204.005(b). A property owners' association must notify all record owners of property in the subdivision in writing of the proposed extension, addition to, or modification of the existing restrictions. *Id.* § 204.005(e).

Keenan argued that there is "no dispute that the [Amended Restrictions] are not valid under section 204.005(b)" because ROPO "admits that it did not obtain approval of the owners of 75% of the real property in the subdivision." Her argument is not supported by the evidence.

27

ROPO's evidence shows that it, on June 2, 2006, ROPO, having determined that it had a sufficient number of votes to approve the amendments, filed in the real property records a "Certification of Receiving and Counting Ballots on Amendments to Reservations, Restrictions, and Covenants Applicable to All Properties Located Within River Oaks Additions." The Certification stated that it had circulated to each of the property owners in River Oaks a copy of the proposed Amended Restrictions, a summary of the amendments, and a ballot, containing a date by which it had to be returned to be counted. And, as required by section 204.005, the owners of at least 75 percent of the real property in River Oaks had voted in favor of and to approve the Amended Restrictions. ROPO certified that:

> According to the ownership records maintained by the Association, the total square footage within all properties in the Subdivision [all sections of River Oaks] is 32,602,253, and the owners of the properties in the Subdivision containing a total square footage of 24,735,885 voted in favor of and to approve the Amended Restrictions (75.87%). The Ballots are and will be kept in the files of the Association.

Thus, even though the return date for the ballots was not until December 1, 2006, ROPO, as early as June 2, 2006, already had the approval from the owners of "at least 75 percent of the real property in the subdivision." *See id.* § 204.005(b).

Keenan argues that ROPO failed to obtain the requisite vote on a section-by-section basis in River Oaks. However, section 204.005(c) provides that

> If a subdivision consisting of multiple sections, each with its own restrictions, is represented by a single property owners' association, the approval requirement *may be* satisfied by obtaining approval of at least

28

> 75 percent of the owners on a section-by-section basis *or* of the total number of properties in the property owners' association's jurisdiction.

*Id.* § 204.005(c) (emphasis added). Thus, subsection (c) provides an alternative that ROPO was not required to utilize.

Keenan argues that ROPO improperly counted ballots circulated in 2005 in achieving its totals. However, ROPO's evidence shows that, in October 2004, it sent a letter to each of the River Oaks property owners, with a list of proposed amendments and a meeting invitation. In March 2005, ROPO sent each of the property owners a copy of the final version of the proposed amended restrictions, a summary of the amendments, a ballot, and a letter seeking an affirmative vote. In January 2006, ROPO determined that the ballots it had circulated did not include a date by which the property owner had to return the ballot for it to be counted, pursuant to the Property Code. Thus, in February 2006, ROPO placed a stamp, stating a due date of December 1, 2006, on each of the ballots that had been previously submitted and returned the ballots to the respective property owners. In an attached letter, ROPO asked the property owners to re-affirm and to re-submit their votes by the due date. ROPO also sent a corrected ballot to each of the property owners who had not previously voted. Thus, as ROPO explained, the presence of the 2006 stamp on each ballot unequivocally established that it was not circulated until 2006.

ROPO also presented the affidavit of its expert, Gregory S. Cagle, who testified that the Amended Restrictions were properly approved by the property owners. Cagle opined, based on his examination of the ballots related to the 2006 proposed amendments, that the ballots were "signed by the owners of property in the River Oaks Subdivision and the Ballot Results Report accurately reflects as to each affirmative ballot received: (1) the identity of the property for which the ballot relates; (2) the square footage of such property; and (3) the section in which such property is located." Cagle testified:

> Based on my analysis of the Ballot Results Report, the 2006 Declaration Amendment was approved by the owners of more than 75% of the real property (in terms of square footage) in the River Oaks Subdivision. In order to form my expert opinion, I performed an audit of the ballots cast by the owners of the real property subject to the 2006 Declaration Amendment (the "River Oaks Subdivision") concerning the approval of the 2006 Declaration Amendment using the 2006 Billing Roll utilized by the Association (the "2006 ROPO Master Database") and the 2006 Master Database of Properties generated by Harris Central Appraisal District (the "2006 HCAD Database").

Cagle further testified, based on his analysis, that:

a. owners of 78.39% of the real property in the River Oaks Subdivision (based on the square footage numbers from the 2006 ROPO Master Database) approved the 2006 Declaration Amendment;

b. 82.00% of the owners of real property in the "fifth section" of River Oaks Addition, consisting of Blocks Twenty-Nine (29) and Thirty (30), in River Oaks Section Five, a subdivision in Harris County, Texas, according to the map or plat recorded in Volume 10, Page 18, of the Map Records of Harris County, Texas (hereinafter referred to as "Section Five") (based on the number

of owners for each property contained therein as reflected in the 2006 HCAD Database) approved the 2006 Declaration Amendment; and

c. Owners of 75.39% of the total number of properties in the Association's jurisdiction (based on the total number of properties identified in the 2006 ROPO Master Database) approved the 2006 Declaration.

Keenan complained that Cagle's calculations were flawed because, in his deposition, he testified that he counted ballots that were dated in 2005, prior to the recirculation of the corrected ballots. The record shows, however, that Cagle testified that he only counted ballots that contained both stamps, i.e., that were circulated on or after February 8, 2006.

Keenan does not direct us to any evidence that raises a genuine issue of material fact as to ROPO's enforcement of the Amended Restrictions as arbitrary and capricious on her asserted grounds.

Having concluded that ROPO presented evidence establishing its right to judgment on its claim for breach of restrictive covenant and that Keenan did not present evidence raising a genuine issue of material fact, we conclude that ROPO conclusively established its right to judgment. We hold that the trial court did not err in granting summary judgment in favor of ROPO on its claim for violation of a restrictive covenant. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick*, 988 S.W.2d at 748.

**B.     *ROPO's Declaratory Claims***

ROPO also moved for a summary judgment asserting that it was entitled as a matter of law to declarations that the Amended Restrictions were validly enacted and enforceable against Keenan's Property; that the Amended Restrictions constituted a valid contract between ROPO and Keenan; and that Keenan was required to remove 1,260 square feet of impermeable surface from the Property to bring it into compliance with the Amended Restrictions.

Declaratory judgments rendered by summary judgment are reviewed under the same standards that govern summary judgments generally. *Hourani v. Katzen*, 305 S.W.3d 239, 248 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Texas Civil Practice and Remedies Code section 37.004 provides that a "person interested under a . . . written contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE § 37.004(a). A contract "may be construed either before or after there has been a breach." *Id.* § 37.004(b). In a declaratory-judgment action, a party who asserts a claim for affirmative relief has the burden of proving its allegations. *Alanis v. US Bank Nat'l Ass'n*, 489 S.W.3d 485, 500 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

As discussed above, ROPO presented evidence that the Amended Restrictions were validly enacted and enforceable against the Property. Accordingly, we

conclude that the trial court did not err in granting ROPO summary judgment on its claim for a declaration that the Amended Restrictions were validly enacted and enforceable against Keenan's Property.

In addition, restrictive covenants constitute a contract between an association and a property owner. *See Hourani*, 305 S.W.3d at 251; *Tien Tao Ass'n, Inc, v. Kingsbridge Park Cmty. Ass'n, Inc*., 953 S.W.2d 525, 533 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Thus, having concluded that the Amended Restrictions are valid and enforceable, we conclude that the trial court did not err in declaring that they constitute a valid contract between ROPO and Keenan. Notably, the evidence reflects that Keenan herself voted in favor of the Amended Restrictions.

Finally, as discussed above, ROPO presented the affidavit of Probstfeld, who testified, based on his survey and inspection, that the allowable impermeable surface area of the Property is 6,580 square feet and that the total combined impermeable surface area in place totals 7,840 square feet. As discussed, Keenan did not present evidence raising a genuine issue of material fact. Thus, ROPO conclusively established that Keenan exceeded the allowable impermeable surface area by 1,260 square feet. We conclude that the trial court did not err in granting summary judgment for ROPO on its claim for a declaration requiring Keenan to remove 1,260 square feet of impermeable surface area from the Property to bring it into compliance with the Amended Restrictions.

33

## C.  *Keenan's Counterclaim to Quiet Title*

Keenan argues that the trial court erred in granting summary judgment in favor of ROPO on her counterclaim to quiet title because the Amended Restrictions were "not properly approved by the requisite number of properties in River Oaks." Thus, ROPO's claim for violation of a restrictive covenant, if enforced, would interfere with her use and enjoyment of the Property. And, the trial court erred in not removing "this cloud on her title to the Property."

To prevail on a claim to quiet title, Keenan must show (1) an interest in a specific property, (2) that title to the property is affected by a claim by ROPO, and (3) that the claim, although facially valid, is invalid or unenforceable. *Vernon v. Perrien*, 390 S.W.3d 47, 61–62 (Tex. App.—El Paso 2012, pet. denied). Thus, her suit to quiet title relies on the invalidity of ROPO's claim to the Property. *See Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 388 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Having concluded above that the Amended Restrictions are valid and enforceable, we conclude that the trial court did not err in granting summary judgment for ROPO on Keenan's counterclaim to quiet title.

## D.  *Keenan's Counterclaim for Fair-Housing Violations*

Keenan argues that the trial court erred in granting summary judgment in favor of ROPO on her "fair-housing counterclaims and related defenses." She brought a counterclaim against ROPO for violations of the FHAA, TFHA, and HFHO. *See* 42

34

U.S.C. § 3604 (FHAA); TEX. PROP. CODE § 301.025 (TFHA); HOUSTON, TEX., CODE OF ORDINANCES, ch. 17, art. III, § 17-12(f) (2021) (HFHO).

ROPO argues that the trial court did not err in granting summary judgment in its favor on Keenan's counterclaim because a review of the record as a whole demonstrates that there were no genuine issues of material fact. ROPO further argues that the FHAA does not apply to Keenan's single-family residence and that this issue became moot upon Gaines's death.

1.    *Fair-Housing Acts and Ordinance*

In 1988, Congress amended the Fair Housing Act to prohibit discrimination against disabled individuals in the national housing market. *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 200–01 (5th Cir. 2000). In 1993, the Texas Legislature enacted the TFHA to provide rights and remedies substantially equivalent to those granted under federal law. *See* TEX. PROP. CODE § 301.002. Both the FHAA and the TFHA make it unlawful:

> To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
>
> (A)    that buyer or renter;
>
> (B)    a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or
>
> (C)    any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1); *see* TEX. PROP. CODE § 301.025(a).

Similarly, it is unlawful:

> To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—
>
> (A) that person; or
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that person.

42 U.S.C. § 3604(f)(2); *see* TEX. PROP. CODE § 301.025(b).

> Under the FHAA and TFHA, "discrimination" includes:
>
> (A) a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises . . . [;]
>
> (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]

42 U.S.C. § 3604(f)(3); *see* TEX. PROP. CODE § 301.025(c).

A "handicap" is defined as (1) a physical or mental impairment that substantially limits one or more of a person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 3602(h); *see* TEX. PROP. CODE § 301.003(6) (similarly defining "disability"). A "dwelling" includes "any building, structure, or portion thereof

36

which is occupied as, or designed or intended for occupancy as, a residence by one or more families." 42 U.S.C. § 3602(b); *see* TEX. PROP. CODE § 301.003(8).

The FHAA and TFHA each provide that an "aggrieved person" may file a civil action to obtain relief. 42 U.S.C. § 3613(a); *see* TEX. PROP. CODE § 301.151. If a trial court finds that a discriminatory housing practice has occurred or is about to occur, it may award the plaintiff actual and punitive damages and may order injunctive relief. 42 U.S.C. § 3613(c); *see* TEX. PROP. CODE § 301.153. It may also award certain attorney's fees and costs. 42 U.S.C. § 3613(c); *see* TEX. PROP. CODE § 301.153.

The HFHO contains substantially similar provisions, including that a person commits an offense if he:

> Refuses to make reasonable accommodations in rules, policies, practices, or services when the accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a housing accommodation; . . . .

HOUSTON, TEX., CODE OF ORDINANCES, ch. 17, art. III, § 17-12(f)(2). The HFHO also provides that "[a]n aggrieved person may file a civil action in state district court" to obtain appropriate relief without regard to whether a complaint has been filed for review by the fair housing administrator. *Id.* art. VI, sec. 17-51(a), (b). If a trial court finds that a discriminatory housing practice has occurred, it may order injunctive relief and may award damages, certain attorney's fees, and costs. *Id.* art. VI, sec. 17-51(d), (e).

37

## 2.    *Applicability*

As a threshold matter, ROPO argues that Keenan's "fair housing claims fail as a matter of law because the [FHAA] does not apply to the Property."[4]  ROPO asserts that, in *Meehl v. Wise*, the court of appeals "squarely held" that the FHAA "does not apply to single-family homes like Keenan's."  285 S.W.3d 561, 571 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

In *Meehl*, homeowners purchased two adjoining lots in a subdivision, on which they began constructing a retreat center, consisting of four guest suites, for persons with bipolar disorder.  *Id.* at 564.  Asserting that the subdivision deed restrictions prohibited use of a lot for anything other than a single-family residence, neighbors sued the homeowners.  *Id.*  The trial court rendered judgment for the neighbors, permanently enjoining the homeowners from constructing the community home.  *Id.*  On appeal, the homeowners argued that the trial court erred in finding that they had failed to show that discrimination under the FHAA had occurred or would occur, as a result of the enforcement of the restriction.  *Id.* at 570.

---

[4]    The TFHA "provide[s] rights and remedies substantially equivalent to those granted under federal law."  TEX. PROP. CODE § 301.002.  The language in TFHA subsections 301.025(a), (b), and (c)(2) is nearly identical to that in FHAA subsections 3604(f)(1), (2), and (3)(B).  *Chavez v. Aber*, 122 F. Supp. 3d 581, 601 (W.D. Tex. 2015) (comparing TEX. PROP. CODE § 301.025 with 42 U.S.C. § 3604(f)).  The HFHO contains substantially similar provisions.  *See* HOUSTON, TEX., CODE OF ORDINANCES, ch. 17, art. III, § 17-12(a), (b), (e), and (f).  Accordingly, we analyze Keenan's claims in the context of the federal act's provisions, but the discussion applies equally to her claims brought under the state and city analogues.

They argued that FHAA section 3604(f)(1), (2), and (3)(B) made it unlawful to discriminate in the provision of housing based on a handicap or to refuse to make reasonable accommodations as necessary to afford an equal opportunity to use and enjoy a dwelling. *Id.* at 570–71.

The court of appeals in *Meehl* concluded, based on FHAA section 3603(b)(2), that "these provisions [section 3604(f)(1), (2), and (3)(B)] do not apply to 'rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.'" *Id*. at 571 (quoting 42 U.S.C. § 3603(b)(2)). Because it was undisputed that the house at issue was a single-family residence in which the homeowners resided and it was not intended to be occupied by more than four families, the court concluded that "section 3604(f) [did] not apply." *Id.* The court held that, apart from inapplicable exception for certain publications, "[s]ection 3603(b)(2) exempts resident homeowners from the protections of all provisions of section of 3604." *Id*.

We disagree that section 3603 should be read to broadly "exempt[] resident homeowners from the protections of all provisions of section 3604." *See id.* The United States Supreme Court has instructed that exemptions from the FHAA are to be read narrowly. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731–32 (1995).

FHAA section 3603(a) provides that the "prohibitions against discrimination in the sale or rental of housing set forth in section 3604 of this title *shall apply* . . . to all dwellings [owned, operated, or funded by the federal government] *and to all other dwellings* except as exempted by subsection (b)." 42 U.S.C. § 3603(a)(2) (emphasis added). Subsection (b) provides that "[n]othing in section 3604," with inapplicable exception, shall apply to:

(1) any single-family house sold or rented by an owner: *Provided*, That such private individual owner does not own more than three such single-family houses at any one time: *Provided further*, That in the case of the sale of any such single-family house by a private individual owner not residing in such house at the time of such sale or who was not the most recent resident of such house prior to such sale, the exemption granted by this subsection shall apply only with respect to one such sale within any twenty-four month period: *Provided further*, That such bona fide private individual owner does not own any interest in, nor is there owned or reserved on his behalf, under any express or voluntary agreement, title to or any right to all or a portion of the proceeds from the sale or rental of, more than three such single-family houses at any one time: *Provided further*, That after December 31, 1969, the sale or rental of any such single-family house shall be excepted from the application of this subchapter only if such house is sold or rented (A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of any employee or agent of any such broker, agent, salesman, or person and (B) without [certain prohibited publications]; . . . , or

(2) rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.

40

42 U.S.C. § 3603(b) (emphasis in original).

Thus, section 3603(b) exempts *sales or rental transactions (homes or rooms) conducted by certain owners* of single-family homes.[5]  *See id.*  It does not exempt *land-use actions* affecting single-family homes, as here.  *See Smith & Lee Assoc., Inc. v. City of Taylor, Mich.*, 13 F.3d 920, 924 n.5 (6th Cir. 1993) (rejecting that city was exempt from section 3604(f) liability by reason of section 3603(b) and holding section 3603(b) exemption applicable only to sale or rental transactions by single-family homeowners and not to municipal actions affecting single-family homes).

---

[5]   Notably, the TFHA analogue clearly exempts certain *sales or rental transactions conducted by certain owners* of single-family homes:

(a)   Sections 301.021 . . . and 301.025 do not apply to:

   (1)   the sale or rental of a single-family house sold or rented by the owner if:

      (A)   the owner does not:

         (i) own more than three single-family houses at any one time; or

         (ii) own any interest in . . . more than three single-family houses at any one time; and

      (B)   the house is sold or rented without:

         (i) the use of the sales or rental facilities or services of a broker, agent, or salesperson . . . ; or

         (ii) [certain prohibited advertisements]; or

   (2)   the sale or rental of the rooms or units in a dwelling containing living quarters occupied by or intended to be occupied by not more than four families living independently of each other, if the owner maintains and occupies one of the living quarters as the owner's residence.

TEX. PROP. CODE § 301.041 ("Certain Sales and Rentals Exempted").

Indeed, the "legislative history of the [FHAA] reflects that when a zoning or land-use ordinance restricts the ability of handicapped individuals [to live] in the community of their choice, that regulation is unlawful." *Robinson v. City of Friendswood*, 890 F.Supp. 616, 622 (S.D. Tex. 1995) (citing H.R. Rep. No. 711, 100th Cong., 2d Sess. 24 (1988), *reprinted in* 1988 U.S. Code Cong. & Admin. News 2173, 2183). The House Report reflects that 3604(f) applies "to state or local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps" and is "intended to prohibit the application of special requirements through land-use regulations, *restrictive covenants*, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." H.R. Rep. No. 711, 100th Cong., 2d Sess. 24 (emphasis added). Thus, section 3604(f) applies "not only to sellers or landlords, but to sophisticated practices such as enforcing zoning or land use laws that have the effect of denying housing to the disabled." *Robinson*, 890 F.Supp. at 622.

Here, Keenan alleges that ROPO's enforcement of a restrictive covenant and refusal of her requested accommodation had the effect of denying housing to her disabled mother-in-law, in violation of section 3604(f). Thus, Keenan alleges that ROPO took discriminatory enforcement action affecting her Property. We conclude that the FHAA applies to the instant proceedings.

42

3.    *Mootness*

ROPO argues that Keenan's counterclaims for violations of the FHAA, TFHA, and HFHO are moot. The record shows that the trial court took judicial notice in its judgment that Keenan's mother-in-law, Gaines, died during the course of the proceedings.

The mootness doctrine implicates subject-matter jurisdiction. *Trulock v. City of Duncanville*, 277 S.W.3d 920, 923 (Tex. App.—Dallas 2009, no pet.). An appellate court is prohibited from deciding a moot controversy or rendering an advisory opinion. *See Nat'l Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999); *City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469 (Tex. App.–Dallas 2007, no pet.) (noting that courts may only decide issues presenting "a live controversy at the time of the decision"). If a controversy ceases to exist or the parties lack a legally cognizable interest in the outcome at any stage, the case becomes moot. *Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 642 (Tex. 2005); *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) (noting that "controversy must exist between the parties at every stage of the legal proceedings, including the appeal"). The same is true if an appellate court's judgment cannot have any practical legal effect upon a then existing controversy. *Zipp v. Wuemling*, 218 S.W.3d 71, 73 (Tex. 2007) ("An appeal is moot when a court's action on the merits cannot affect the rights of the parties.").

43

"The FHA allows any 'aggrieved person' to bring a housing-discrimination lawsuit." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017) (citing 42 U.S.C. § 3613(a)). The statute defines an "aggrieved person" as "any person" who "claims to have been injured by a discriminatory housing practice." *Id.* (citing 42 U.S.C. § 3602(i)); *see also* TEX. PROP. CODE § 301.003(1). There is not a requirement that the complainant be the disabled person. In addition, under the FHAA, "a violation occurs when the disabled resident is first denied a reasonable accommodation." *Groome Res.*, 234 F.3d at 199. The FHAA, TFHA, and HFHO provide for injunctive relief, actual and punitive damages, reasonable attorney's fees, and costs. *See* 42 U.S.C. § 3613(c); TEX. PROP. CODE § 301.153; HOUSTON, TEX., CODE OF ORDINANCES, ch. 17, art. VI, sec. 17-51(d), (e).

Here, Keenan, and not Gaines, brought fair-housing claims against ROPO based on its alleged refusal in 2013 to allow Keenan to exceed the impermeable cover restriction at the Property in order to accommodate a disabled person. *See* 42 U.S.C. §§ 3604(f), 3613(a)). The asserted violation occurred in 2013. *See Groome Res.*, 234 F.3d at 199. Keenan's requested relief includes actual and punitive damages, attorney's fees, and costs. *See* 42 U.S.C. § 3613(c); TEX. PROP. CODE § 301.153; HOUSTON, TEX., CODE OF ORDINANCES, ch. 17, art. VI, sec. 17-51(d), (e). Whether Keenan can recover her asserted damages, attorney's fees, and costs remains a live controversy. *See Hallman*, 159 S.W.3d at 642; *Briones v. Brazos*

44

*Bend Villa Apartments*, 438 S.W.3d 808, 813 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (concluding that fee dispute constituted live controversy). Accordingly, we hold that Keenan's fair-housing counterclaim is not moot.

4.    *Fair-Housing Counterclaim*

In her counterclaim against ROPO, Keenan alleges that ROPO "refus[ed] to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled person] equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(b).

Again, the FHAA makes it unlawful to discriminate in a sale or rental of, or to otherwise make unavailable or deny, a dwelling to any buyer or renter or to discriminate against any person in the terms, conditions, or privileges of a sale or rental, or in the provision of services or facilities in connection with such dwelling, because of a "handicap" of (A) a buyer or renter; (B) a person "residing in or intending to reside in" the dwelling after it is sold, rented, or made available; or (C) any associated person. *Id.* § 3604(f)(1), (2). "For purposes of [subsection (f)], discrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

45

Thus, to establish her claim of discrimination under section 3604(f), Keenan must prove: (1) that she or a "person residing in or intending to reside in" her dwelling is "handicapped," as defined in section 3602(h); (2) that ROPO knew or should reasonably have been expected to know of the disability; (3) that accommodation of the handicap may be necessary to afford the disabled person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that ROPO refused to make the requested accommodation. *See* 42 U.S.C. §§ 3602(h), 3604(f)(1), (2), (3)(B); *Chavez v. Aber*, 122 F. Supp. 3d 581, 595 (W.D. Tex. 2015); *see, e.g.*, *Eastwood v. Willow Bend Lake Homeowners Ass'n, Inc.*, No. 4:20-CV-00400, 2020 WL 3412409, at *2–3 (E.D. Tex. June 22, 2020).

In its motion for summary judgment, ROPO argued, with respect to the first and second elements, that the summary-judgment evidence establishes that, at the time she sought an accommodation, Keenan failed to identify a handicapped individual who resided or intended to reside at the Property. *See* 42 U.S.C. §§ 3602(h), 3604(f)(1), (2), (3)(B). And, thus, ROPO did not know, and could not have reasonably been expected to know, of a disability *at the time* that it denied Keenan's requested accommodation, i.e., Proposal 2. *See* 42 U.S.C. § 3604(f)(3)(B); *Groome Res.*, 234 F.3d at 199 (holding FHAA violation occurs when disabled resident is "first denied a reasonable accommodation").

46

In support, ROPO presented Keenan's Proposal 2, dated February 20, 2013, which contains notations that Keenan's stated objectives in seeking to exceed the impermeable cover limitation were access, security, and "trying to get cars off the street." ROPO also presented the deposition testimony of Jeffrey L. Lyman, a member of the Board and chairman of the ROPO Building and Restrictions Committee in 2013. Lyman testified that, at a committee meeting in March 2013, Keenan stated that she sought to exceed the impermeable cover limitation on behalf of her niece, who "had some sort of debilitating disease that ultimately might require her to come live with them." And, "as a result, they wanted to accommodate the potential need for her living there by installing these handicap access elements in their house."

ROPO's evidence shows that, in a March 19, 2013 letter to Keenan, ROPO notified her that it would not approve Proposal 2, but that she could proceed with construction as previously approved in Proposal 1. And, in a December 2, 2013 letter to Keenan, ROPO notified her that it had discovered that she had commenced construction in accordance with the rejected Proposal 2. ROPO demanded that Keenan cease all installation of exterior surfaces and submit plans to remedy the violation of the impermeable-surfaces limitation.

ROPO's evidence also shows that, at a December 4, 2013 committee meeting, Keenan stated that she had commenced construction in accordance with Proposal 2

because she volunteers and hosts events a minimum of once per month, "special events require additional space," she was trying to have the "most gracious access" to the house possible, and that she was "not required to change [her] lifestyle." ROPO also presented Keenan's July 12, 2018 deposition testimony, in which she confirmed that this discussion was accurate.

ROPO's evidence shows that, in a December 17, 2013 letter to ROPO, Keenan's counsel stated that Keenan was close to completing the construction of a new house on the Property and that, during construction, her in-laws had "suffered a decline in their health," such that her mother-in-law "now requires a wheelchair." Accordingly, Keenan and her husband "modified their original plans to provide wheelchair access and other accommodations to [her in-laws]." However, the letter neither identified Keenan's mother-in-law nor her handicap. *See* 42 U.S.C. § 3604(f)(1), (2), (3)(B).

On May 20, 2015, ROPO moved to compel Keenan to identify the mother-in-law and her handicap. *See* 42 U.S.C. § 3604(f)(3)(B); *see also* § 3602(h) (defining "handicap"). At a June 1, 2015 hearing on the motion to compel, ROPO complained that Keenan, in order to support her claim under the FHAA, was required to identify the disabled person needing the asserted accommodation and that Keenan had refused. Keenan's counsel responded that because Keenan's mother-in-law would not be called to testify at trial, Keenan was not required to identify her.

48

Subsequently, during her June 17, 2015 deposition testimony, Keenan identified her mother-in-law as Lavera Gaines and testified that she had arthritis.

The FHAA prohibits a "*refusal* to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(B) (emphasis added). That is, a plaintiff must actually request an accommodation and be *refused* in order to bring a claim under the FHAA. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008). The duty to make a reasonable accommodation

> does not simply spring from the fact that the handicapped person wants such an accommodation made. Defendants must instead have been given an opportunity to make a final decision with respect to [the] request, which necessarily includes the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law.

*Id.* at 1218–19. "In other words, [a defendant] cannot be liable for refusing to grant a reasonable and necessary accommodation if [it] never knew the accommodation was in fact necessary." *Id.* at 1219 (internal quotations omitted).

Here, the evidence shows that it was not until two years *after* ROPO's March 19, 2013 rejection of Keenan's Proposal 2, eighteen months after litigation had commenced, and only in response to a motion to compel, that she first revealed the identity of her mother-in-law to ROPO and the nature of her handicap. Thus, ROPO's summary-judgment evidence establishes that Keenan did not, before ROPO

denied her requested accommodation, identify to ROPO any individual as "handicapped," as defined by the FHAA. *See* 42 U.S.C. § 3604(f)(1), (2), (3)(B); *Groome Res.*, 234 F.3d at 199 ("Under the Fair Housing Act . . . a violation occurs when the disabled resident is first denied a reasonable accommodation.").

We conclude that ROPO's summary judgment evidence establishes its right to judgment against Keenan on her counterclaim for violations of the FHAA, TFHA, and HFHO. *See Siegler*, 899 S.W.2d at 197. Accordingly, the burden shifted to Keenan to present evidence raising a genuine issue of material fact precluding summary judgment. *See id.*

In her summary-judgment response, Keenan asserted that she asked ROPO to "allow her to exceed the hardscape limitation in the [Amended Restrictions] to accommodate her handicapped mother- and father-in-law" on March 16, 2013, i.e., three days before ROPO's March 19, 2013 rejection of Proposal 2. In support, she cited the following portion of her deposition testimony:

> Q. March 16, 2013 was the first time that you asked for an accommodation for a disabled person, isn't that correct?
> A. That is correct.
> Q. And for whom were you asking for the accommodation? I mean, what is the name or the identity of the disabled person for whom you were requesting an accommodation?
> A. My husband's mother and father.
> Q. And can you give my their full names, please?
> A. Well, his father is since deceased, but it's Charles R. Gains.
> Q. Uh-huh.

50

Q.    And Lavera Gaines.

Q.    Were either Charles R. Gains or Lavera Gaines living with you at [the Property]?

A.    No, ma'am.

Keenan also quoted a lengthy portion of her deposition testimony in which she described learning that her in-laws needed to come and live with her and her husband.  However, in the quoted portion of her deposition, Keenan testified that, at the time that she first learned about her in-laws need to come and live with her: "My house was already constructed at that point, to a point where it was—you know, we were within six months or so of moving in . . . ."  And, she testified that she moved into the house in 2014.

Keenan further testified that, at the time she submitted Proposal 2 to ROPO, in which she sought the accommodation, she was unaware of anyone who actually needed an accommodation.  Rather, only she and her husband resided at the Property, and she sought it for herself and her husband for the future, as follows:

Q.    Well, Ms. Keenan, you testified that Mr. Gaines, the senior Mr. Gaines, informed you in November of 2011 that they were going to have to come live with you.  The plans you submitted to ROPO were dated in 2011 and did not include—

A.    I don't believe that's correct.

Q.    I believe it is.

A.    It was—

Q.    Are you changing your testimony, Ms. Keenan?

51

A. No, ma'am. I'm clarifying what I—the dates I told you, *it was within less than six months of when we moved in, which was in [20]14.* So that . . . .

Q. That's not what you previously testified to, Ms. Keenan.

A. Well, then I misspoke. Because it was—the timeline is not— what you just told me is not correct. We didn't know that that far in advance.

Q. *You knew, however, Ms. Keenan, that someone with a disability was going to be living in your home in 2011 when you submitted plans?*

A. *No, ma'am.*

Q. *So all the handicap accessibility features that you planned into your home —*

A. *Were for my husband and myself. For future.*

. . . .

A. Because at the time, 2011, both my husband and I were hale and hearty. . . .

(Emphasis added.) Thus, Keenan later "clarif[ied]" that she did not know that her mother- and father-in-law needed the accommodation at issue until it "within less than six months of when [Keenan] moved in, which was in [20]14."

Further, during her 2018 deposition, when Keenan was asked whether she was aware that none of the members of the Board or Committee recalled her having ever mentioned Gaines at any of the meetings prior to December 2013, she replied in the negative. When asked whether she had specifically named Gaines, she replied: "I don't recall if I did or not."

Keenan also points to her counsel's December 17, 2013 letter to ROPO, "notifying" it that Keenan was close to completing the construction of a new house

52

on the Property and that her mother-in-law had suffered a decline such that she "now requires a wheelchair." However, this letter is dated 9 months *after* ROPO's March 19, 2013 rejection of Proposal 2. In addition, the letter neither identifies Keenan's mother-in-law nor any handicap.

Keenan also points to a December 20, 2013 letter from ROPO to Keenan's counsel, in which she asserts that ROPO "confirmed that [Keenan] had informed [ROPO] during the approval process that she had a disabled family member that required modification to her landscaping plan." The letter reflects that ROPO reiterated that, on March 6, 2013, Keenan submitted revised landscape plans that were significantly different than those submitted in November 2011. Among other modifications, the proposed impermeable space increased to 7,845, which was well above that allowed for the Property. ROPO noted that this request would, therefore, require a variance. The revised landscape plan also added a raised landing and steps on three sides at the front door. As this element was over the front setback line for the home, a variance was also required for its approval. ROPO noted that, in support of her request, Keenan had stated that she "needed the additional space and entryway modifications because they entertained often" and because Keenan's "niece (who is handicapped) may need to live with them in the future." On March 19, 2013, ROPO advised Keenan that it had denied her requested variance, but that she could commence construction based on her previous plan, i.e., Proposal 1. The letter does

53

not identify the niece, identify a handicap, state that the niece required handicap accessibility, or assert that the niece resided or intended to reside at the Property. Notably, the letter also does not mention Gaines.

Evidence raises a genuine issue if reasonable jurors could differ in their conclusions in light of *all of* the summary-judgment evidence. *Mayes*, 236 S.W.3d at 755. Here, ROPO's evidence establishes that Keenan did not, at the time ROPO denied her requested accommodation, i.e., Proposal 2, identify a handicapped individual, as defined in section 3602(h), who resided or intended to reside at the Property. *See* 42 U.S.C. § 3604(f)(1), (2), (3)(B). Thus, the evidence establishes that ROPO did not know, and could not have reasonably been expected to know, of a disability *at the time* that it denied Keenan's requested accommodation, i.e., Proposal 2. *See* 42 U.S.C. § 3604(f)(1), (2), (3)(B); TEX. PROP. CODE § 301.025(c)(2); HOUSTON, TEX., CODE OF ORDINANCES, ch. 17, art. III, sec. 17-12(f)(2); *Groome Res.*, 234 F.3d at 199 ("Under the Fair Housing Act . . . a violation occurs when the disabled resident is first denied a reasonable accommodation."). And, Keenan did not present evidence raising a genuine fact issue as to these elements.

Accordingly, we conclude that ROPO conclusively established its right to judgment on Keenan's fair-housing counterclaim. *See Schwarz*, 544 F.3d at 1219 (holding defendant "cannot be liable for refusing to grant a reasonable and necessary

54

accommodation if [it] never knew the accommodation was in fact necessary"); *Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, Inc.*, 347 F. App'x 464, 468 (11th Cir. 2009) (holding that trial court did not err in granting summary judgment for condominium association on property owner's federal and state fair-housing act claims because his evidence, in which he presented unclear and inconsistent explanations as to nature and extent of his disability and refused to comply with subsequent requests for reasonable documentation, thus preventing association from conducting meaningful review of his application, was insufficient to raise fact issue on association's knowledge of disability and necessity of accommodation).

We hold that the trial court did not err in granting summary judgment in favor of ROPO on Keenan's fair-housing counterclaim.  *See* TEX. R. CIV. P. 166a(c); *Martinez*, 941 S.W.2d at 911.

We overrule Keenan's first issue.

**Evidentiary Issues**

In her second issue, Keenan asserts that the trial court erred in excluding portions of her summary-judgment evidence. She challenges the exclusion of (1) portions of the affidavit of Jacobus and two attachments; (2) portions of the affidavit of Murphy and two attachments; and (3) the affidavit of Valentine.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.

1998). "[I]n addition to showing an abuse of discretion, a party complaining of error in the exclusion of evidence must also show that the trial court's error was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment." *Madison v. Williamson*, 241 S.W.3d 145, 151 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see* TEX. R. APP. P. 44.1(a)(1); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995).

1.    *Jacobus*

Keenan complains that the trial court erred in excluding portions of the affidavit of Jacobus, an attorney who examined the ROPO ballots and the Langdon ballots and presented a conclusion that ROPO did not obtain sufficient approval of the proposed Amended Restrictions. She also complains that the trial court erred in striking the Langdon ballots and rescission forms.

ROPO moved to strike portions of the Jacobus affidavit because the trial court had previously entered an order striking Keenan's designation of Jacobus as an expert insofar as he was to offer legal opinions and because Jacobus's testimony was conclusory. It moved to strike the Langdon ballots and rescission forms, which were created and circulated by a property owner not affiliated with ROPO, as having no legal effect.

Expert affidavits opposing a motion for summary judgment must present probative evidence of the facts at issue. *Ryland Group v. Hood*, 924 S.W.2d 120,

122 (Tex. 1996). In addition, conclusory statements, not supported by factual allegations, are insufficient to defeat summary judgment. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984). A statement is conclusory if it provides a legal conclusion but does not provide the underlying facts to support the conclusion. *See Pipkin v. Kroger Tex., L.P.*, 383 S.W.3d 655, 670 (Tex. App.—Houston[14th Dist.] 2012, pet. denied).

In his affidavit, Jacobus offered legal conclusions, in contravention of the trial court's prior order. In addition, he offered conclusions "based on his audit" of the total votes received without explaining any of his underlying methodology. Notably, he states in his affidavit that he reviewed the Langdon ballots, which were not created or circulated by ROPO and thus are of no legal effect. We conclude that the trial court did not err in excluding the complained-of testimony and Langdon ballots and rescission forms.

2.    *Murphy*

Keenan complains that the trial court erred in excluding portions of the affidavit of Murphy, an architect and accessibility specialist, who testified regarding the reasonableness and necessity of the requested accommodation, i.e., exceeding the impermeable cover limitations in the Amended Restrictions. She also complains that the trial court struck his attached "General Site and Building Elements," discussing handicap accessibility, and his letter, dated December 3, 2013, containing

his opinions on the suitability and necessity of the parking area and loading zones at the Property.

Because we held above that the trial court did not err in granting summary judgment for ROPO on Keenan's fair-housing claim based on the first and second elements, i.e., identifying a person residing or intending to reside at the Property as "handicapped" under the FHAA, we do not reach the third and fourth elements of her claim, i.e., whether the requested accommodation was reasonable and necessary. Because the Murphy evidence speaks to the third and fourth elements, we do not reach whether the trial court erred in excluding this evidence.

3.  *Valentine*

Keenan complains that the trial court erred in excluding the affidavit of Paul M. Valentine, a registered professional surveyor, who testified that he performed a survey of the Property on February 11, 2014 and that "the area of the house is 3,098 square feet, the area of the garage is 950 square feet, the area of the concrete flatwork is 3,231, and the total surface area of these improvements is 7,279 square feet."

Even were we to conclude that the trial court erred in excluding Valentine's affidavit, Keenan cannot show that such error was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1). Valentine's calculations approximated those of ROPO's expert, Probstfeld, who testified that, based on his October 8, 2014 survey and his inspection

of the Property, the combined area of improvements and impermeable surfaces on the Property totaled 7,840 square feet. Further, as discussed above, Keenan judicially admitted that the existing hardscape on the Property totaled 7,331 square feet. Thus, Valentine's affidavit is cumulative of other evidence, including Keenan's admission that she exceeded the impermeable surface limitation in the Amended Restrictions.

We overrule Keenan's second issue.

## Conclusion

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Kelly and Landau.